UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES SCOTT,

        Plaintiff,

                                      Case Number 06-14903-BC

v.                                       Honorable Thomas L. Ludington

HEMLOCK SEMICONDUCTOR CORP.,

        Defendant.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING, IN PART, HIS CLAIM

On October 27, 2006, Plaintiff James Scott filed a complaint against his former employer, Defendant Hemlock Semiconductor Corporation, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000e *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq*. Plaintiff bases his claims, in part, on purportedly racially charged remarks by his supervisor, who allegedly recommended the termination of Plaintiff's employment. Now before the Court is Defendant's motion for summary judgment under Federal Rule of Civil Procedure 56.

Plaintiff timely filed an objection to the magistrate judge's order. Defendant has filed a response. The Court has reviewed the parties' submissions and finds that the facts and the law have been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

I.

Plaintiff, who is African-American, formerly worked for Defendant as a technician in its Science and Technology Testing Department. Part of his responsibilities included testing the product (polycrystalline silicon), which would ensure its quality and prevent significant financial losses of scrapping low-quality product. Testing the product required taking a core sample in a clean room. Plaintiff began working for Defendant in 1983.

He maintains that he faced racial comments over his tenure, such as when he first received training at a particular job, at some point around 1985, and the man training him twice referred to bringing a whip to work to train him. Other co-workers, in the 1990s, allegedly referred to him as a "nigger" on several occasions. Plaintiff states that he reported these incidents but that nothing was done.

Plaintiff also contends that in 1999 or 2000, he was transferred against his wishes and paid less than his co-workers, purportedly because of his then-supervisor's racial discrimination against him. Plaintiff states that he filed a complaint but that Defendant did not respond. Plaintiff also maintains that he was one of the lowest paid in his position, although his next supervisor, Don Bussa, refused to provide him with an increase in pay or title, despite pushing him to take on more leadership. He testified that, beginning around 2000, his co-workers did not make racially insensitive remarks.

Plaintiff further states that this new supervisor, the testing team leader, twice put his hands around Plaintiff's neck and made a comment about choking him. (Bussa became Plaintiff's supervisor in 1999.) In his deposition, Plaintiff expressly acknowledged that those incidents had no racial content. He dated those events as possibly occurring in the spring of 2005 and then January 2006. He described the first event as a joke that he did not appreciate. The second event allegedly

occurred in the context of his supervisor's insistence that Plaintiff not wear gold necklaces, because gold was appearing in their testings, coupled with Plaintiff's resistance to removing his jewelry.

According to Plaintiff, he felt discriminated against when other employees (all of whom were Caucasian) were afforded extra breaks, longer lunches, and more flex time.

Plaintiff alleges that, on April 20, 2005, his supervisor once called him boy, calling out a door "Hey boy, hey boy, hey boy, are you out there?" *Scott Dep*., p. 252; Dft. Br., Ex. A [dkt #21-2]. Plaintiff recounts that the supervisor apologized the next day but that Plaintiff simply walked away from him.

Plaintiff states that, in July 2005, he, his supervisor, and two other employees were involved in a conversation about how quickly they could complete a particular process that each performed as part of their jobs. According to Plaintiff, the supervisor related he could do it better and faster than Plaintiff. The supervisor allegedly said that "he would put his white hood on and come in in the morning and he would whip [Plaintiff] . . . ." *Id*. at 126. Plaintiff recounts that the conversation immediately continued as follows:

> [Supervisor:] This didn't come out right.
> [Plaintiff:] That came out just the way you wanted it to be said. So you're a Klansman.

*Id*. The supervisor purportedly excused himself immediately. Plaintiff, in his deposition, next explained that doing that task required wearing a hood, which he described as bluish but which had previously been white.

Plaintiff recounts another conversation with the same supervisor from a few weeks later. According to Plaintiff, they were discussing the vast property that came with Defendant's $10 million expansion. Plaintiff maintains that the supervisor "told [him] that we have so much land out

back that he could take [Plaintiff] out back and hang me and nobody would ever find me." *Id*. at 136. Plaintiff explains that he experienced this as a racial remark.

The supervisor denies making any of these remarks. *Bussa Dep*., p. 25; Dft. Br., Ex. C [dkt #21-4].

At some point in 2005, Defendant undertook a review of its processes to improve them further. As part of this review and subsequent to it, so as to ensure compliance with revised procedures, Defendant installed videocameras to record shifts and to track conduct on the shift against product quality and output.

At some point during the effort to create recordings, some videotapes were blank and had not recorded. Around February 6, 2006, Plaintiff's supervisor arranged to install a surveillance camera on the other camera that recorded production. Surveillance footage showed Plaintiff entering the room with the camera, crossing toward that camera, and then exiting the room.

Plaintiff's supervisor reported this circumstance to Defendant's director of that department, Dave Pasek, and to a human resources manager, Laura Lambeth. At the department director's inquiry, Plaintiff's supervisor recommended that Plaintiff's employment be terminated.

The department director and the human resources manager met with Plaintiff on February 23, 2006. At that meeting, Plaintiff denied that he had stopped the recorder on the date in question, but he admitted that he had done so previously. He stated that he recognized that doing so was wrong and that he did it to be a "smart aleck," as well as out of a sense that Defendant was selectively recording employees in a manner that Plaintiff felt was unfair to him.

The department director made the decision to terminate Plaintiff's employment, relying on performance records and disciplinary history. The human resources manager also made a

back that he could take [Plaintiff] out back and hang me and nobody would ever find me." *Id*. at 136. Plaintiff explains that he experienced this as a racial remark.

The supervisor denies making any of these remarks. *Bussa Dep*., p. 25; Dft. Br., Ex. C [dkt #21-4].

At some point in 2005, Defendant undertook a review of its processes to improve them further. As part of this review and subsequent to it, so as to ensure compliance with revised procedures, Defendant installed videocameras to record shifts and to track conduct on the shift against product quality and output.

At some point during the effort to create recordings, some videotapes were blank and had not recorded. Around February 6, 2006, Plaintiff's supervisor arranged to install a surveillance camera on the other camera that recorded production. Surveillance footage showed Plaintiff entering the room with the camera, crossing toward that camera, and then exiting the room.

Plaintiff's supervisor reported this circumstance to Defendant's director of that department, Dave Pasek, and to a human resources manager, Laura Lambeth. At the department director's inquiry, Plaintiff's supervisor recommended that Plaintiff's employment be terminated.

The department director and the human resources manager met with Plaintiff on February 23, 2006. At that meeting, Plaintiff denied that he had stopped the recorder on the date in question, but he admitted that he had done so previously. He stated that he recognized that doing so was wrong and that he did it to be a "smart aleck," as well as out of a sense that Defendant was selectively recording employees in a manner that Plaintiff felt was unfair to him.

The department director made the decision to terminate Plaintiff's employment, relying on performance records and disciplinary history. The human resources manager also made a

back that he could take [Plaintiff] out back and hang me and nobody would ever find me." *Id*. at 136. Plaintiff explains that he experienced this as a racial remark.

The supervisor denies making any of these remarks. *Bussa Dep*., p. 25; Dft. Br., Ex. C [dkt #21-4].

At some point in 2005, Defendant undertook a review of its processes to improve them further. As part of this review and subsequent to it, so as to ensure compliance with revised procedures, Defendant installed videocameras to record shifts and to track conduct on the shift against product quality and output.

At some point during the effort to create recordings, some videotapes were blank and had not recorded. Around February 6, 2006, Plaintiff's supervisor arranged to install a surveillance camera on the other camera that recorded production. Surveillance footage showed Plaintiff entering the room with the camera, crossing toward that camera, and then exiting the room.

Plaintiff's supervisor reported this circumstance to Defendant's director of that department, Dave Pasek, and to a human resources manager, Laura Lambeth. At the department director's inquiry, Plaintiff's supervisor recommended that Plaintiff's employment be terminated.

The department director and the human resources manager met with Plaintiff on February 23, 2006. At that meeting, Plaintiff denied that he had stopped the recorder on the date in question, but he admitted that he had done so previously. He stated that he recognized that doing so was wrong and that he did it to be a "smart aleck," as well as out of a sense that Defendant was selectively recording employees in a manner that Plaintiff felt was unfair to him.

The department director made the decision to terminate Plaintiff's employment, relying on performance records and disciplinary history. The human resources manager also made a

recommendation to terminate Plaintiff's employment, based on her own investigation, which included discussing Plaintiff's prior complaints of racial discrimination with Defendant's equal employment opportunity officer, Kim Houston-Philpot.[1] The supervisor, too, made the same recommendation to end Plaintiff's employment. Yet both the department director and the human resources manager testified that the supervisor did not make the decision to terminate. According to the human resources manager, at the time of Plaintiff's termination, he was the only African-American at that facility.

The department director provided an unsigned affidavit, which has attached a list of disciplinary actions against Plaintiff. Those incidents included the following: (1) a verbal warning for not following safety protocols that lead to exposure to acid fumes in November 2005; (2) a suspension for exiting and re-entering a clean room in the same garments in May 2005; (3) issues regarding sick and leave time and documentation thereof, from 2001 to 2006; and (4) a verbal warning for sleeping during a meeting in February 2003. Annual reviews for Plaintiff in January 2005 and 2006 were fairly positive, but they included some negatives and a notable decline over the two years. Plaintiff added notes describing his protest to both reviews and refused to sign the 2005 review.

---

[1] Plaintiff seeks to make some type of suggestion that the human resources manager's investigation was incomplete because she reviewed only the personnel file provided to her by Plaintiff's supervisor, i.e., the "manager's file," rather than the totality of Plaintiff's personnel file, which was kept at corporate headquarters. At most, the record offered by Plaintiff establishes that three documents from 1991 and before were not included in the materials that the human resources manager reviewed. Those documents allegedly were complaints of racial discrimination. Based on attachments to Plaintiff's motion to amend (which the Court previously denied), Defendant correctly notes that the complaints that Plaintiff suggests might have been culled from the "manager's file" all predate the supervisor's tenure, which commenced in 1999. Consequently, those documents would not have been included in his file on Plaintiff.

On September 14, 2006, the Equal Employment Opportunity Commission (EEOC) sent Plaintiff a right to sue letter. On October 27, 2006, Plaintiff filed his complaint, and, to reiterate, that complaint alleges race discrimination in violation of Title VII and ELCRA. Defendant subsequently filed a motion for summary judgment under Rule 56.

II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

A.

42 U.S.C. § 2000e-2(a)(1) provides:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

A plaintiff may rely on direct or circumstantial evidence to demonstrate a Title VII claim. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).

If a plaintiff presents direct evidence of discrimination, then a court need not employ the framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), because the direct evidence eliminates the need for that inferential demonstration of discrimination. *See Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985) (citations omitted). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 153 (2000); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006). Failure to prove an essential element of a *prima facie* case need not prove fatal, if a plaintiff can provide sufficient evidence of intentional discrimination. *See Noble v. Brinker International, Inc.*, 391 F.3d 715, 721 (6th Cir. 2004). This burden of persuasion remains with the plaintiff. *Id.*

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (citations omitted). Thereafter, the defendant can show that it would have terminated the plaintiff's employment had it not been motivated by discrimination. *Id.* (citations omitted). Direct evidence does not require a factfinder to draw inferences that the challenged employment action was motivated by prejudice. *Johnson*, 319 F.3d at 865 (citation omitted). In *Johnson*, the Sixth Circuit concluded that a variety of statements about an African-American employee's purported performance and intellectual

deficiencies and about the possible consequence to business of his race (where he was one of eight people of that race in the town) required additional inferential steps to link racial discrimination to the employee's termination; therefore, the employee had not provided direct evidence of discrimination.

Further, as noted by Defendant, the Sixth Circuit has stated, "[A] statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) (citation omitted). Yet that point came in the context of discussing Michigan law about 20 years ago. More importantly, the Sixth Circuit has subsequently clarified the import of employee statements:

> In assessing the relevancy of a discriminatory remark, we look first at the identity of the speaker. An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of age discrimination. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("Statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."). This court later explained, however, that the *McDonald* rule was never intended to apply formalistically, and that remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, were relevant.

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-355 (6th Cir. 1998) (citations omitted). In *Ercegovich*, the court concluded that the allegedly discriminatory comments of a vice president who reviewed the decision to terminate an employee could provide evidence of discrimination and, thus, prevented summary judgment on that ground. *Id*.

Similar to Title VII, ELCRA bars employers from taking an adverse employment action based on "discriminat[ion] against an individual with respect to employment . . . because of . . . race

-8-

. . . ." Mich. Comp. Laws § 37.2202. Just as with the federal cause of action, a plaintiff proceeding under the state cause of action can rely on direct evidence of racial discrimination and go forward without employing any burden-shifting framework. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520 (Mich. 2001). Any differences between Title VII jurisprudence and ELCRA jurisprudence, as applied to this case, are negligible; indeed, the parties have not identified or argued any such difference

In the instant case, the supervisor uncontestedly participated, in some fashion, in reaching the conclusion that Plaintiff's employment should be terminated. The supervisor, at the request of the department director, recommended the termination. That the department director reached the final decision, or that the human resources also made a recommendation to that same end based on her own investigation, does not remove the supervisor from the zone of influence described in *Ercegovich*. The supervisor's input was sought out and used, so Defendant cannot argue that he did not play a meaningful role in that decision.

That same supervisor made at least three comments that, on their face, appear to be racially insensitive. Unlike the situation in *Johnson*, where further inferences would have been necessary to conclude that racial discrimination motivated an adverse employment action, no such inference is required here. Only a handful of months prior to Plaintiff's termination, his supervisor – who recommended his termination – made racially charged comments to Plaintiff. More specifically, the supervisor suggested that he might "put on a hood" and whip Plaintiff and that he might hang Plaintiff deep on the property, and he also called Plaintiff "boy." Based on these incidents, Plaintiff has established a case of racial discrimination based on direct evidence.

Plaintiff also refers to incidents from 8 to 20 years earlier. Although the Court does not condone the racially discriminatory remarks that Plaintiff alleges he experienced during that time period, those remarks cannot provide the basis for Plaintiff's claims of racial discrimination in 2005. 42 U.S.C. § 2000e-5(e)(1)[2] imposes a limitation period on Title VII claims. The limitation period bars claims based on events that occurred 300 days before a plaintiff files an EEOC complaint. *See also Nat'l RR. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Even though neither party has identified when Plaintiff filed his EEOC complaint, it strains probability to believe that the discriminatory events that allegedly occurred in 1991 or earlier would fall within the limitation period applicable to litigation filed in 2006. Consequently, Plaintiff's claim of racial discrimination based on direct evidence can only proceed on events that occurred within the limitation period of § 2000e-5(e)(1).

B.

Without direct evidence, the burden-shifting analysis of *McDonnell-Douglas* will apply. *Johnson*, 215 F.3d at 573. First, a plaintiff must establish a *prima facie* case. Although Plaintiff is

---

[2]42 U.S.C. § 2000e-5(e)(1) imposes a limitation period of 300 days for a person to file a complaint in this circumstance:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, *such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred* . . . .

(Emphasis added.)

not particularly clear on this point, he may be advancing a claim under Title VII based on disparate treatment. Such a claim requires a plaintiff to show that "1) he was a member of a protected class; 2) he was subject to an adverse employment action; 3) he was qualified for the job; and 4) for the same or similar conduct, he was treated differently from similarly situated non-minority employees."[3] *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (citations omitted). Once a plaintiff establishes a *prima facie* case, then the defendant may respond by offering a legitimate, non-discriminatory reason for its employment action. *Johnson*, 215 F.3d at 573 (citation omitted). Then a plaintiff may rebut a defendant by demonstrating that the defendant's offered reason was only pretext. *Id*. (citation omitted).

The Sixth Circuit has defined "similarly situated" as "individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citation omitted). The plaintiff must show that the class of "comparables," comprised of non-minority employees, are similarly situated in all respects. *Id*.

Under Michigan law, a plaintiff can establish a prima facie case of "disparate treatment" race discrimination, a plaintiff by showing "that [he] was a member of the class entitled to protection under the act and that, for the same or similar conduct, [he] was treated differently than one who was

---

[3] More generally, a *prima facie* case of race discrimination under Title VII requires a plaintiff to show "(1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citation omitted).

a member of a different race." *Betty v. Brooks & Perkins*, 521 N.W.2d 518, 523 (Mich. 1994) (citations and internal quotations omitted). Michigan also uses the burden-shifting framework of *McDonnell-Douglas* for establishing an inferential basis for racially motivated employment discrimination. *See Snieciniski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich. 2003) (citations omitted). As noted in the discussion of a direct evidence case above, any difference between Title VII and ELCRA has not been addressed by the parties and, so, will be assumed not to be dispositive.

Here, Plaintiff has offered evidence on three of the four elements of a discrimination claim based on circumstantial evidence. Yet he has not identified any class of similarly situated employees. He does refer to several other employees and his sense that they were, somehow, treated differently. The totality of his explanation of differential treatment is the following list: "racial statements, physical assaults, [lower pay than his Caucasian co-workers, despite his quality performance], the arbitrary issuance of disciplinary actions and the videotaping of his performance." Pl. Rs. Br., p. 16 [dkt #27]. Yet he admits that other employees were videotaped and does not identify what disciplinary actions he would place at issue. He offers nothing, other than his own belief, to support his claim of lower pay. Next, regarding racial statements and physical assaults, it seems that Plaintiff's argument is that he faced these issues and that others did not. By and large, Plaintiff leaves to the Court to intuit what actions were taken that were different as to him than as to others. It may be that he, an African-American, was terminated, and his Caucasian co-workers were not. Without further explanation by Plaintiff, it is difficult to conclude that he has made out a *prima facie* case of race discrimination.

Even if Plaintiff did succeed in showing a *prima facie* case, Defendant has offered a legitimate non-discriminatory reason for Plaintiff's termination. Plaintiff admitted that he disrupted a process Defendant instituted to review quality, i.e., he stated that he had ejected a videotape designed to record employees and to track whether they conformed to new procedures. Further, Defendant makes allegations of Plaintiff's poor performance and excessive leave. Although Plaintiff disagreed with his supervisor's assessment in some of his performance reviews and although the affidavit recounting most of these deficiencies is unsigned by the department director, these factors further support concluding that Defendant had a legitimate non-discriminatory reason for terminating Plaintiff's employment.

Similar to Plaintiff's attempt to demonstrate a *prima facie* case, he provides little argument regarding pretext. He may suggest that his performance reviews show that he was generally a solid performer on whom his supervisor relied. Yet Plaintiff does not further explain how that demonstrates the existence of a pretext. Consequently, the Court cannot conclude that he has rebutted Defendant's reason for terminating him. Accordingly, because Plaintiff has not shown all the elements of a *prima facie* case of race discrimination and because Defendant has offered a legitimate, non-discriminatory reason for ending his employment, the Court will deny Defendant's motion for summary judgment as to a claim of racial discrimination based on circumstantial evidence.

IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [dkt #21] is **GRANTED IN PART** and **DENIED IN PART**. To the extent that Plaintiff advances a claim based on racial discrimination under Title VII or ELCRA based on direct evidence within the limitation

period of 42 U.S.C. § 2000e-5(e)(1), his claim remains, but to the extent that his claim is based on circumstantial evidence or time-barred direct evidence, his claim is **DISMISSED WITH PREJUDICE**.

                                                  s/Thomas L. Ludington
                                                  THOMAS L. LUDINGTON
                                                  United States District Judge

Dated: November 1, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 1, 2007.

                              s/Tracy A. Jacobs
                              TRACY A. JACOBS